Good morning, Your Honors. Alisa Tawana-Peterson for Petitioner. I will be submitting on most of the issues, except I did want to briefly discuss two of the uncertified issues. Maybe keep your voice up. No, see, you have to stay in the middle of those two mics. All right. Okay. I would like to discuss two of the uncertified issues. One of them was the anticipated testimony of Lew Tran, because that was rather troubling, in that in the opening statement — Just to help me out to make sure I'm on the right place, you covered a number of uncertified issues in your brief, and I want to make certain I'm focused on the right one. Yes. I think — I believe it would be number — the fourth one. I'm not — So you're referring here to the opening statement comments regarding the anticipated testimony? Yes. Prosecutor's opening statement comments regarding the anticipated testimony of Lew Tran. That's on page 32. And the opening statement comments were troubling because it referred to inculpatory statements made by the defendants, including the co-defendants. And I believe — Can you summarize that opening statement comment? Well, basically, it was an explanation made to Lew Tran, who was Chalmerath's girlfriend. And Chalmerath was the one who had the plea agreement and who testified at trial. His girlfriend wanted to know why he was shot. So there was allegedly a meeting between her and the other defendants, which would refer to their involvement in the robbery and how Chalmerath accidentally got shot. And what's troubling about it is that there is, I believe, special weight that the jury could have placed on a statement which is a, quote, confession to involvement in the robbery. And it was in a forum where there was no cross-examination possible. And it was also a Bruton error because it referred to statements of the co-defendants, hearsay statements of the non-testifying co-defendants. And so, you know, it's — and it was also impermissible vouching because it referred to something outside the record which really bolstered Chalmerath's testimony. And the whole case based — was based primarily on his testimony because none of the victims could identify who the robbers were because they were wearing masks. And so it was all up to Chalmerath. And his — this reference to his girlfriend's testimony really bolstered his testimony. Didn't one of the victims identify one of the defendants, at least by voice identification? Well, it was rather ambiguous, but there was more than one person identified by the name Van. I think the father of one of the other defendants said that his son was called that as well. So it was rather ambiguous. But the main evidence against the defendants was Chalmerath's testimony. And then the other issue was the attempted murder charge against — in regards to Officer Avila, because the defendant was convicted of two attempted murder charges. One was in regards to Officer Hill, and the other was in regards to Officer Avila. And the record shows that co-defendant Tran opened the door and Officer Avila, was on the left side of the double doors, Officer Hill was on the right side, and he was to the side of the double doors on the right side. So when Tran opened the door and he aimed — testimony was that he aimed the gun directly at Officer Hill, he would have to be facing away from Officer Avila. So the only evidence was that Tran pointed the gun at Officer Hill. There was shots, and then quickly ran into the house. And then the other evidence was that there was some expended 9-millimeter shells. And that is really — How many shots were fired? Actually, I'm uncertain as to the exact number of shots. I believe to Officer Hill it was — I think it was one shot. There were two shots. One missed. One missed, yeah. Yes. But, you know, there were some 9-millimeter shells in the house, but that is really insufficient when we're talking about premeditated murder, because we're talking about in the brief, you know, there's a state case that shows, you know, what's required for finding a — Charging a premeditated murder charge? Yes. It was first degree — I'm sorry. Premeditated. Premeditated. Attempted murder, not murder. Well, was it even premeditated? Wouldn't it be felony murder? Well — I mean, premeditated is a law case. These are officers that have happened upon a robbery in progress. Well, what he was convicted of was a premeditated deliberate attempted murder for both officers. And that's why I'm saying that it was certainly insufficient in regards to Officer Avila, because there was no gun pointed at him. There was no testimony that, you know, he was being shot at. It was all based on these expended shells. That's basically all I have to say, unless the Court has some questions. Okay. Any questions? I don't have any questions. Thank you. I'd like to reserve some time. All right. Good morning. May it please the Court. Deputy Attorney General Kevin Viena for the respondent in this case. Your Honor, I believe our briefing has covered the certified issue, that is, whether there was improper vouching. I would add only that while this Court has been very vigilant about vouching over the last decade, and there are a number of cases, this case is not close to any case where there's been found to be an impropriety. In fact, there is an unavoidable and striking contrast between this case and United States v. Young in the mid-1980s, where the Supreme Court also expressed the desire to be vigilant against prosecutorial conduct that is designed to bring about wrongful convictions. There's nothing about the statements in this case, the three very brief statements, offhand statements that suggest there was any design on the part of the prosecutor. There were three brief remarks to say, essentially, that he was sensitive to the juror's time. There was no need to call the doctor to prove serious bodily injury to the officer who was struck by one of the bullets. And there was no need to call all four of the victims in the home of Julie and Quy Tran. That is, Brother Danny and Sister Amy weren't called as witnesses, but that was a matter of no consequence to establish that they were the robberies of victims. I have, well, consistent with this Court's rule, I'm neither briefed nor prepared to argue extensively the uncertified issues in this case. I'm unaware of the Court's desire to address any uncertified issues. Kennedy. Let me just pose a question. It doesn't waive your right under our rule. You're well within your rights not to brief. And if for some reason we address the issues, you'll have an opportunity to address  But I'm just a little – I have out of context. I did read the appellant's brief and had not understood this to be a premeditated murder charge. Attempted premeditated murder. I'm sorry. Attempted premeditated murder. Was that, in fact, the case? Yes, that is correct. And that was – it was an issue at trial. And essentially we had one of the co-defendants, Kem Tran, who fought – who went to the door. The officers went to the neighborhood on a prowling complaint by a neighbor. There they came upon Julie Tran's grandfather, who had escaped unnoticed by the four assailants. They contacted him. He described the events at the house and went over. The officers and the grandfather went to the house, knocked on the door for a while. Some time passed, and eventually Kem Tran came downstairs, threw the door open, and fired twice at the two officers who were there. That's essentially the evidence. There was additional evidence with regard to motive and premeditation, and that is that Kem Tran, in the home invasion robbery that had occurred in Fontana six days earlier, had, in fact, shot one of the persons there. So the evidence was that he was reluctant to be captured. So where does the premeditation come in? Well, under California law, premeditation can occur very quickly. Oh, I know that. Instantaneously. My response would be simply that if you know someone is outside the door, if you open the door and fire immediately where you expect that person to be, where it strikes one of the officers near center of mass, that's sufficient to establish that you had thought about your actions, prepared to conduct them, and intended to kill. Near center of mass. One of the officers was struck in the shoulder, I believe. It was a .32? Yes, Your Honor. It was a .32 caliber semi-automatic weapon that had been discovered at the house. Mr. Tran, co-defendant Tran, went there. What night? I'm unsure. Well, I'll confess. This is simply my mind having registered this in terms of felony murder just because it was a robbery and losing track of what State we're in and which set of statutes. So I apologize for the digression, but I was just taken aback, because I hadn't thought about it in terms of premeditation. I hope I've responded to the Court's question. Addressing. It does strike me. It does strike me that, you know, an argument, a closing argument, when a prosecutor, you know, said that, oh, we had a witness list. I think he said it was close to 70, but, you know, only used half of those witnesses. So there's kind of an implication there that we had a whole, you know, and testify against a defendant, but our case is so strong and our witnesses were so good that, you know, there's no need for us to do that. Your Honor, I appreciate the Court's concern. I would ask only that the Court follow the direction of the United States v. Young, and that is look at those comments in the full context of the trial and the argument. The prosecutor's argument was very long. The only real issue in this case was identification. You don't condone that, do you? Your Honor, I would not condone. Of course, I could not condone a prosecutor who was suggesting that there was additional evidence to support conviction that could have been presented and was not. Isn't that what happened here? Your Honor, you're asking for my opinion there. My opinion is no, that's not what happened. This prosecutor did the – this prosecutor simply said that the evidence was sufficient to establish that the injury to the officer was serious bodily injury. That wasn't a matter of contest. If he had suggested there was additional evidence on identification of any of the defendants or of a – I mean, all he'd need was one doctor. He wouldn't need another 30 people or whatever. Correct. Why would it just be focused on that gunshot wound to the police officer? Well, that was the context of the first statement. Your Honor, prosecutors and defense counsel regularly make what are, I would say, irrelevant comments to the jury expressing thanks for their participation in the criminal justice system, thanks for their engaging in a civic duty that some people are reluctant to engage in, thanks for their attention during the course of a long trial. Well, that's all right. And I believe that when viewed in the context of the entire closing argument, really that's all this prosecutor was doing, was saying that he was sensitive to the time needs of the jurors. Well, he could have just said that and not said, well, you know, I had another 30 people I could have brought in here, but I didn't think it was necessary. The – I don't think he said, I don't think it's necessary. But I agree with the Court that that is a possible inference that can be – that is a possible inference. But I don't think that was the intended, nor was it the inference likely to be drawn by the jurors in this case. The inference likely to be drawn was that the evidence presented at trial was sufficient to convict, not that there was additional evidence that could have been presented in support, and that it was unnecessary to increase the length of the trial beyond what had occurred. What was the length of the trial? It was – I don't recall the number of days, but it was several days, in part because there was extensive evidence about other act misconduct on the part of these defendants from the court. It wasn't about 30 days. It was a very long trial. It was a longer trial than a typical robbery trial is. With regard to Ms. Peterson's argument about the opening statement from the prosecutor where he referred to the expected testimony of Chow Yun-Rath's girlfriend, I believe that the district court addressed that issue extensively and correctly, saying that that essentially is covered by Frazier v. Cupp, United States Supreme Court case. That also that there was – that there were clear indications that both the prosecution and the defense expected Julie – expected Liu Tran to testify at trial, and they were continuing to engage in producing her. So there was no – there's certainly no indication of an intentional – of intentional misconduct by the prosecutor. And the United States Supreme Court has said that opening statement is that. It's a statement of what evidence is expected to be produced. I believe it would be holding prosecutors to an improper burden to punish them if they have – if it turns out that they're incorrect. All right. If there are no other questions, thank you very much for your attention. First of all, to clarify, the issue in regards to the attempted murder charge was a webinar petitioner's appellate counsel was ineffective for failing to raise the issue of insufficiency of evidence. And, of course, it is Petitioner's position that counsel was ineffective because that was definitely an issue and Petitioner would most likely prevail on it, you know, considering the circumstances and considering the fact that they found 9-millimeter shell casings when it was a 30 – 32-millimeter that, you know, actually shot the officer. Well, let me see. Pause. Didn't – I remember it was faulty before, but it seemed to me that it must have been your brief, because the State didn't argue this, didn't you tell us in your brief that one of the other defendants actually did raise this issue? I take it if they did, they were unsuccessful. So what causes you to say that that raising – the appellate counsel was ineffective because if the issue had been raised, it probably would have been successful? No. I believe that was with the severance issue. I believe that the other counsel raised the idea that there should be a separate trial, and district court felt that that would have been futile because the other party had been – if Petitioner had raised it, it would be futile because the other party had already raised it and the court had denied it. And as far as the vouching issue, it really is interesting to note that there were several references to the fact that there were, you know, a lot of other witnesses out there. It wasn't just one passing reference. I think it was trying to get this idea through the back door that there could have been a lot of people to support the prosecution's case, but since there was just so many witnesses already, they didn't use it. So I believe that it shows impermissible vouching. Let me – I see on – there's a footnote in your brief, footnote 7, page 45. The issue of insufficient evidence to convict the defendants on count 2 was raised through co-defendant trans counsel. Oh, I'm sorry. Again, I'm reconstructing this off of the brief that I read a few days ago, but I think that may be what I'm – what I was remembering. So was this issue raised by another defendant?  Tell you the truth, I'm – well, I believe that the court of appeal did deny it. I'm not sure I don't have the opinion in the co-defendant's case, so. But it was – Well, it's likely we would have known and you would have remembered if, in fact, that issue had been successful. Yes. So it's fair to infer that it wasn't, which comes back to the question of is there some other reason to think that the issue would have been fruitful to pursue on appeal since the defendant that may have pursued it did not? Well, I don't – I don't think the co-defendant didn't, you know, raise that – raise the, you know, identical factual situations, et cetera. So it would, you know, just because the co-defendant raised it doesn't mean that, you know, you would not – you would not succeed. Okay.  Thank you very much. Thank you very much, Your Honor. I appreciate the argument. And the Court will now adjourn.
judges: Pregerson, Clifton, Hicks